UNITED STATES DISTRICT COURT THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
JON ERIC CHANEY,

      Plaintiff,

  -against-

      Defendants.

GENE SZYMANSKI, and LOCAL 32BJ, SEIU

------------------------------------------------------------ X

**AMENDED COMPLAINT**

ECF Case 23-CV-3652 (VSB)(SLC)

**JURY DEMANDED**

Plaintiff JON ERIC CHANEY ("Plaintiff"), by and through his attorneys, DeLince Law PLLC, as and for his Complaint, alleges as follows:

### INTRODUCTION

1. This is a "hybrid" action against Defendant Local 32BJ for violating its duty of fair representation under federal law, pursuant § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 158/ fair duty of representation guaranteed by the NLRA, 29 U.S.C. §185(a) *et seq.* against his Union.

2. This is also an action against Defendant Local 32BJ and Defendant Gene Szymanski, individually, for discrimination as to disability, perceived disability, and failure to accommodate and retaliation for opposing discrimination in the workplace based on race and sex, pursuant to § 8-107(1) *et seq.*, of the Administrative Code of the City of New York.

3. This is also an action for injunctive and declaratory relief, back pay, front pay, liquidated damages, compensatory and punitive damages, attorneys' fees, costs and other relief to redress the DFR claim as well as the discrimination claims.

## JURISDICTION

4. Plaintiff originally filed a complaint in the New York State Supreme Court in New York County on January 17, 2023 (Index No. 100058-2023). On or about May 1, 2023, Defendants removed the case to this Court (23-cv-3652), pursuant to 28 U.S.C. §§1441 and 1446 based on this Court's original jurisdiction over the federal question presented (ECF Doc. #1). As such, Plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. 1367(a) over and City Law claims.

5. Venue is properly laid in this district pursuant to 28 U.S.C.§1391(b) in that the unlawful discriminatory practices alleged below were committed within this district.

6. During all relevant times herein, Plaintiff was a resident of the State of New York, County of Kings, and a union member of Defendant Local 32BJ, Service Employees International Union ("Defendant 32BJ" or "the Union").

7. During all relevant times herein, Gene Szymanski ("Defendant Szymanski" or "Szymanski"), was an employee of Defendant 32BJ.

8. Upon information and belief, Defendant 32BJ is a "labor organization" as defined in 8-107(1)(c) of the Administrative Code of New York City.

## BACKGROUND

9. Plaintiff is a 42-year-old White male.

10. Plaintiff is a person with a neurological disability who suffered a job injury that resulted in a concussion with post-concussion syndrome.

11. Lumiere Condominium ("Lumiere" or "the Building"), who is not a party to this action, owns a residential building located at 350 W 53rd St. in New York County.

12. AKAM Associates Inc., ("AKAM") is the Building's managing agent and runs its day-to-day operations. Neither Lumiere nor AKAM is a party to this action.

13. Michael Irizarry ("Irizarry") is the superintendent of the Building and Plaintiff's direct supervisor.

14. Plaintiff was employed by the Building for about ten years, as a doorman and concierge, from the summer of 2012 until his termination on September 1, 2021.

15. During his employment Plaintiff responsibilities were to log in, provide customer service, and greet all tenants and guests. Plaintiff also logged and organized all packages and dry cleaning that came into or exited the building for tenants. He further logged in and out all keys to the tenants and enforced the guests list. If tenants had an issue, Plaintiff logged it in the shift log and passed it on to Irizarry, Additionally, he cleaned the lobby, sanitized all touch surfaces, and opened the door for all tenants and guests.

16. Plaintiff worked Friday through Tuesday from 2:45 p.m. to 10:45 p.m. and in addition, Plaintiff worked overtime as needed by management. As part of the benefits, Plaintiff had health insurance coverage and a pension administered by the Building Service 32-BJ Benefit Fund.

17. In 2008, Plaintiff joined Local 32BJ, (the "Union"). As a Union member, Plaintiff paid dues, attended union rallies, and voted in union elections.

18. The terms and conditions of this employment were governed by the collective bargaining agreement ("CBA") between the Building and the Union.

19. The Building staff consisted of seven doormen/concierges, and a porter, Jose Diaz ("Diaz"). Jason Figueroa ("Figueroa") was a fellow doorman who worked at the building and Diaz was the sole porter.

20. By February 2021, Plaintiff had worked at the building for over eight years without reprimand or discipline.

21. The staff is composed of all Hispanic males, and Plaintiff was the sole non-Hispanic White male.

22. Plaintiff was treated disparately when compared to the Hispanic staff members.

23. Plaintiff often complained about Diaz's constant and baiting verbal attacks and discrimination against him. Diaz would make statements like "kill the white man and kill him until he's dead" and he would always make racially charged statements such as, "white man is the devil, the white man is the devil, evil the white man is the devil." Some of these statements were witnessed by Irizarry.

24. Plaintiff complained to Irizarry several times, who in turn told Diaz that he had to stop harassing Plaintiff but Diaz would not stop.

25. Plaintiff was not permitted to arrive late for work, whereas Plaintiff's coworkers were not reprimanded for their lateness.

26. Plaintiff was not permitted to keep food in the fridge, however, Plainitiff's coworkers kept food in the refrigerator.

27. Figueroa would often make sexually explicit comments, including crude comments about the size of his penis or homophobic statements about the tenants. He was aware that Plaintiff was uncomfortable with his "trash talk" and continued to taunt Plaintiff.

28. Despite the disparate treatment and harassment, Plaintiff continued to do his job.

29. On May 8, 2020, Plaintiff was injured at work when his head hit against a luggage cart's metal bar while attempting to stop two intruders from entering the lobby. As a result of that injury, at times, Plaintiff suffers from dizziness and poor, unsteady balance, and experiences painful headaches at times.

30. That same day, Plaintiff recorded the incident in the front desk shift log and completed a worker's compensation incident report several days later.

31. Plaintiff also opened a claim before the NYS Worker's Compensation Board.

32. Some of the staff members would also taunt Plaintiff about the noticeable bump he had on his head.

33. At all relevant times herein, Plaintiff was disabled within the meaning of § 8-102(16) of the

34. New York City Administrative Code in that he suffers from a physical, medical, mental or psychological impairment, or a history or record of such impairment.

35. Plaintiff was also a qualified individual with a disability in that he could, with intermittent reasonable accommodations, perform the essential functions of his job.

36. On or about February 9, 2021, Figueroa unfairly instigated an argument during which Figueroa voiced to Plaintiff many of his grievances about the delivery of certain packages, and the condition of the storage closet and the bathroom. During the exchange, the conversation became heated, and Irizarry intervened and calmed things down.

37. Both Plaintiff and Figueroa filed harassment police reports against each other.

38. On February 25, 2021, Plaintiff was notified by email by Justin Estevez ("Estevez"), an AKAM Executive, that he was indefinitely suspended without pay, pending a final determination while Figueroa continued to work.

39. After Plaintiff had received the suspension, he met with Estevez. During the meeting, Plaintiff stated to Estevez that he felt that the indefinite suspension was unfair since it was the first incident and both employees were involved in an exchange.

40. Plaintiff also reminded him that he was recovering from my on-the-job injury and as a union member he had rights. Estevez responded by saying, "That's your problem." Plaintiff understood that statement to mean that one of the reasons he was being suspended due to his allegedly delusionary belief that he had rights because he was a union member with a disability.

41. Gene Szymanski is a field representative for the Union and holds himself out as representing Union members with labor relations issues.

42. On March 19, 2021, Plaintiff met with Szymanski, during which he was given a Last Chance Agreement (LCA). which he was forced to sign in order to return to work.

43. During his discussion with Szymanski, Plaintiff requested that he be permitted to speak to an attorney before signing the LCA. Szymanski slammed his hands on the desk and demanded that he sign the document immediately if he wanted to get his job back.

44. The Agreement stated that Plaintiff could return to work as of March 23, 2021, and identified the LCA as a final warning, even though this had been his first warning during my employment.

45. Plaintiff voiced his concern to Szymanski that he was being stripped of all his CBA rights by signing the LCA and that he needed to speak to an attorney before signing.

46. In response, Szymanski, to induce Plaintiff to sign the agreement, reassured Plaintiff by saying, "…as long as you don't raise your voice, you'll be fine."

47. He further assured Plaintiff, during the conversation, by promising him that should Plaintiff be terminated from the Building a transfer to another building would be possible. "I believe the transfer to another building will be on the table. I'll speak to Justin [at AKAM] …we can put you somewhere else," Szymanski stated.[1]

48. As a result of the referenced promises, while unable to consult with counsel, Plaintiff signed the LCA under duress.

49. Plaintiff signed the LCA and noted near his signature "received" to note that he was signing the LCA under protest and without the benefit of the advice of counsel.

50. During the meeting, Plaintiff also stated to Szymanski that he was experiencing head trauma, from his job injury, which made it difficult to concentrate, but that did not deter Szymanski on insisting that Plaintiff sign the agreement.

51. As part of the LCA, Plaintiff was also required to complete an Anger Management Program, which he completed and received a certificate.

52. On or about July 12, 2021, management also scheduled mandatory in-house training, for the entire staff, on de-escalating tension and controlling anger at work. Plaintiff attended the training along with the entire staff. Figueroa was not required to complete an Anger

---

[1] Plaintiff possesses a recording of Szymanski's statement.

Management Program and he was the only one absent during the in-house training. These are yet again examples of the disparate treatment Plaintiff received as compared to Figueroa.

53. On Sunday, August 29, 2021, Plaintiff was an hour late for work due to a new dosage of prescription medication, which he had taken the night before, that had not been properly calibrated.

54. That day, at about 2:40 p.m., Plaintiff received a call from Irizarry inquiring as to his whereabouts. Plaintiff, realizing that he had overslept due to his medication, apologized and, rushed to the Building within an hour.

55. That day, Plaintiff did not take his regular one-hour break in order to make up for his lateness. The day concluded without incident.

56. The Building should have known that Plaintiff was asking for reasonable accommodations, after he explained to both the Building and the Union that he was late due to a new medicine he had taken that had not calibrated properly.

57. Yet, on September 1, 2021, Plaintiff received a telephone call conference from superintendent Irizarry and Isaac Pomper ("Pomper") an AKAM Executive. Pomper stated that Plaintiff was receiving a write-up for a no-call no-show and that since he was on an LCA it would result in a termination that was effective immediately.

58. That same day, Plaintiff also received a letter from Pomper confirming his termination for coming in late on August [29], 2021, which effectively violated the terms of the LCA.

59. On September 3, 2021, Plaintiff filed a grievance with the Union stating that he was unjustly terminated.

60. In the mail, Plaintiff received a letter from the Union dated September 27, 2021. The letter stated that he should contact Grievance representative Szymanski.

61. On November 3, 2021, Plaintiff received a letter from the Union, dated November 3, 2021, stating that the Step 2 meeting was scheduled for November 18, 2021.

62. By letter dated November 5, 2021, Lawrence Sean Schwartz, Ph.D., Plaintiff's licensed psychotherapist, who had been treating Plaintiff since August 2014, wrote an extensive letter to Szymanski explaining how the medication that Plaintiff was taking had not well calibrated and that a maximum dose of antidepressant medicine and extreme stress had caused him not to hear the alarm clock on August 30, 2021, which resulted in his delay to the Building that day.  He also stated that Plaintiff's condition was diagnosed as the beginning of "serotonin syndrome" caused by the high dose of his antidepressant.

63. The Step 2 meeting was subsequently adjourned twice, at the Building's request. The Step 2 meeting was first rescheduled for December 21, 2021, and again canceled and rescheduled for January 13, 2022.

64. At all relevant times herein, the Union and the Building were aware of Plaintiff's on-the-job injury, and medical reason he was late for work on August 29, 2021.

65. After Plaintiff had placed several calls and emails to Szymanski which remained unanswered, he attempted to see him in person at the Union office. On November 10 and again on December 10, 2021, Plaintiff went to the Union office but was told by the Security Guard that Plaintiff was banned from entering the building.

66. The Security Guard told Plaintiff that the directive came from a higher power in the Union. The Security Guard also told Plaintiff that he should have received a letter explaining that all correspondence must be done by phone or e-mail.

67. On November 18, 2021, Kevin Stavris, Vice President of Union, stated to Plaintiff "I was just talking to our attorney before I came downstairs because I wanted to make sure everything is

right. And this case that you have now is a Step 2 hearing, it's a preliminary hearing. We'll try to get it worked out and resolved there, but if it doesn't, it goes on to the next process is arbitration."

68. On January 13, 2022, Plaintiff attended the WebEx Step 2 meeting. At the meeting, Employer was represented by attorney Harry Weinberg ("Weinberg") and AKAM Management Executive Isaac Pomper. Present for the Union was Grievance representative Gene Szymanski.

69. During the meeting, Weinberg stated that the Building did not want to take him back.

71. Then, Weinberg asked Pomper if there were more infractions against Plaintiff besides the one reported. Pomper answered there were some small things the superintendent did not deem noteworthy. Next, Weinberg asked Pomper if they could speak at the end of the meeting. Pomper responded that he would be available to speak.

72. Within minutes after the hearing, Plaintiff received a telephone call from Szymanski who stated that he was sorry and that the Building did not want to take Plaintiff back. Szymanski indicated that the Step 2 write-up indicated as much.

73. On January 26, 2022, Plaintiff went to the Union lobby and spoke with Grievance representative Angelo Petitto ("Petitto"). Petitto told Plaintiff that the Union was taking Plaintiff's case to arbitration. Petitto asked Plaintiff who his union lawyer was. Plaintiff responded that no one had been assigned to him. Petitto looked baffled that Plaintiff was not assigned a union lawyer.

74. On January 28, 2022, Plaintiff received a letter from the Union in the mail. The letter stated that the Union determined that his grievance lacked sufficient merit to prevail in arbitration. For that reason, the Union was not interested in proceeding with his case to arbitration.

75. On or about March 4, 2022, Plaintiff filed an appeal with the Union's grievance and appeal board ("GAB").

76. On March 9, 2022, Anna Skorupa replied that Plaintiff case would be scheduled for a GAB hearing on March 23, 2022, by Zoom.

77. Although Plaintiff had made a request to the Union to have an attorney present on his behalf, Plaintiff was not provided with an attorney for the hearing. On March 23, 2022, Plaintiff attended the GAB hearing. At the hearing, there was a panel of three individuals. During the appeal, Plaintiff asked one of the panelists whether they had relevant documents in preparation for the hearing. The panelist looked confused and stated that he had a letter from Plaintiff's doctor. The other two panelists did not ask any other questions. That was the end of the hearing. It was evident that no one on the panel had read the packet of approximately 20 documents Plaintiff had submitted in preparation for the hearing.

78. By letter dated April 6, 2022, Plaintiff received a letter from GAB via mail. The letter stated that Local 32BJ Joint Executive Board had adopted the recommendation of the GAB. As a result, his appeal was denied based on the determination that the complaint lacked sufficient merit for the Union to prevail in arbitration.

79. Ironically, by letter dated April 11, 2022, long after Plaintiff had been terminated, the Union sent a letter addressed to Pomper at AKAM. The Union relayed Plaintiff's complaint that Figueroa and Diaz had been harassing Plaintiff while performing his job duties. The Union asked that Figueroa and Diaz be instructed to immediately cease and desist from further harassing behavior or be cited for harassment. Should the harassment continue, the Union stated that they would be forced to take further actions regarding this matter.

80. The irony of this letter is that it was sent long after Plaintiff was terminated from employment and should have rightly been sent while he was still employed at the Building and had complained about the harassment Plaintiff was receiving from his colleagues. Further, the document incorrectly stated that Figueroa was Plaintiff's supervisor.

81. On November 9, 2022, Plaintiff emailed Defendant Szymanski asking for a transfer to another building as he had been promised at the time the LCA had been signed on March 19, 2021.

82. Defendant Szymanski responded by email that "…The Union does not place employees in other buildings since we have no control over who the employers hire." This contradicted the statement he had made to Plaintiff to induce him to sign the LCA, which agreement stripped Plaintiff of all his rights.

83. During his employment at Lumiere, Plaintiff was eligible to receive and did receive health insurance coverage, which was among the benefits Lumiere offered all of its full-time employees, all of whom were members of the Union and received benefits through the Union's plan. The Union's plan is funded by employer contributions, including contributions required to be made by Lumiere on behalf of Plaintiff while he was employed by Lumiere.

84. Upon information and belief, the pension plan in which Plaintiff was enrolled while employed by Lumiere constitutes an employee pension plan as defined by ERISA.

### AS AND FOR A FIRST CAUSE OF ACTION

85. Plaintiff repeats and realleges each and every allegation of paragraphs 1 to 84 of this Complaint as if fully set forth herein.
86. Defendant Local 37BJ violated § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 158/ fair duty of representation guaranteed by the NLRA, 29 U.S.C. §185(a) *et seq*.

## AS AND FOR A SECOND CAUSE OF ACTION

87. Plaintiff repeats and realleges each and every allegation of paragraphs 1 to 84 of this Complaint as if fully set forth herein.

88. Defendants willfully subjected Plaintiff to intentional discrimination based on his *disability and perceived disability*, in violation in violation of § 8-107(1) *et seq.* of the Administrative Code of the City of New York.

## AS AND FOR A THIRD CAUSE OF ACTION

89. Plaintiff repeats and realleges each and every allegation of paragraphs 1 to 84 of this Complaint as if fully set forth herein.

90. Defendants' acts, practices, and policies described herein constitute a denial of Plaintiff's *need for reasonable accommodation of his disability*, by failing to enter into a cooperative dialogue in violation of § 8-107(1)(a) of the Administrative Code of the City of New York.

## AS AND FOR A FOUR CAUSE OF ACTION

91. Plaintiff repeats and realleges each and every allegation of paragraphs 1 to 84 of this complaint as if fully set forth herein.

92. Defendants' acts, practices, and policies described herein constitute *retaliation* against Plaintiff for his opposition to discrimination and harassment, in violation of § 8-107(7) of the Administrative Code of the City of New York.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Declare, adjudge, and decree that Defendant Union violated Plaintiff's fair representation rights, pursuant to § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 158/ fair duty of representation guaranteed by the NLRA, 29 U.S.C. §185(a) *et seq.*

2. Declare, adjudge, and decree that Defendants Union and Szymanski willfully subjected Plaintiff to discrimination based on his disability or perceived disability, pursuant § 8107(1)(a) *et seq.* of the Administrative Code.

3. Declare, adjudge, and decree that Defendants Union and Szymanski willfully failed to reasonably accommodate Plaintiff, pursuant § 8-107(1)(a) of the Administrative Code *et seq.*

4. Declare, adjudge and decree that Defendants Union and Szymanski retaliated against Plaintiff for opposing discrimination and harassment in the workplace, pursuant to § 8107(1)(a) *et seq.* of the Administrative Code of the City of New York.

5. As to damages, this Court is requested to award Plaintiff compensatory damages in an amount to be determined at the time of trial, including for back pay, front pay, lost benefits, and damages for emotional distress and mental anguish, attorney fees and costs and punitive damages. And any such other award and further relief as this Court deems appropriate, just and equitable.

Dated: New York, New York
　　　　July 26, 2023

　　　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　DELINCE LAW PLLC

　　　　　　　　　　　　　　　　　　　　*Attorney for Plaintiff*
　　　　　　　　　　　　　　　　　　　　299 Broadway, Suite 1310
　　　　　　　　　　　　　　　　　　　　New York, New York 10007
　　　　　　　　　　　　　　　　　　　　Tel:  212 382-3544
　　　　　　　　　　　　　　　　　　　　jpd@delincelaw.com

　　　　　　　　　　　　　　　　　　　　*J. Patrick DeLince*
　　　　　　　　　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　J. Patrick DeLince (JD5795)